UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

| | | |
|---|---|---|
| SARAH CONTE, JOANNE TOUCHBERRY, TEKISHA L. NICHOLSON, TOBY BELIVEAU, ALEXANDER CARLISLE, and EARLENE N. HUNTER, Individually and on Behalf of the WakeMed 403(b) Plan and All Others Similarly Situated,<br><br>                  Plaintiffs,<br><br>    vs.<br><br>WAKEMED,<br><br>                  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR LIABILITY UNDER ERISA |

Plaintiffs Sarah Conte, Joanne Touchberry, Tekisha L. Nicholson, Toby Beliveau, Alexander Carlisle and Earlene N. Hunter (collectively, "Plaintiffs") individually and on behalf of all others similarly situated, bring this action by and through their undersigned attorneys based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, a review of U.S. Department of Labor ("DOL") filings by WakeMed ("Defendant"), U.S. Securities and Exchange Commission ("SEC") filings, defined contribution plan documents, media reports about WakeMed, and an analysis of available fund and investment information. Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action individually, on behalf of a class of all participants in the WakeMed Retirement Savings Plan (the "Plan") between August 25, 2014 to the date of Judgment (the "Class Period"), and on behalf of the Plan, for breach of fiduciary duty pursuant to Sections 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1109 and 1132 against WakeMed.  As alleged herein, Defendant has breached its fiduciary duties of prudence and loyalty with respect to the Plan to the detriment of the Plan and its participants and beneficiaries.

2.      WakeMed, which is based in Raleigh, N.C., describes itself as a private, not-for-profit health care organization.  The Plan is a defined contribution plan under Section 403(b) of the Internal Revenue Code (the "IRC") and is offered to employees of WakeMed and WakeMed Physician Practices ("WPP").

3.      ERISA, which regulates the operation of the Plan, requires Plan fiduciaries to act prudently and solely in the interest of the Plan's participants and beneficiaries.  To safeguard

against imprudence and disloyalty in defined contribution plans, ERISA imposes strict duties of loyalty and prudence upon plan fiduciaries. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1). When structuring the Plan and selecting investments, fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. §1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. §1104(a)(1)(B). Plan fiduciaries are required to act with undivided loyalty, act prudently, and defray reasonable plan expenses. 29 U.S.C. §1104(a)(1). The duties of loyalty and prudence are "the highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citation omitted); *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007).

4. Under 29 U.S.C. §1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), §7. Furthermore, "The Restatement [of Trusts] . . . instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts §90, cmt. b) ("*Tibble II*").

5. To meet their fiduciary obligations, the Plan's fiduciaries are required to establish and maintain a prudent process when selecting and monitoring the Plan's investment options and establishing and evaluating Plan expenses. Defendant, however, breached its fiduciary duties by

- 2 -

engaging in a flawed and imprudent process and failing to act in the best interest of Plan participants.

6.      The marketplace for retirement plan services is established and competitive. The Plan has a large pool of assets totaling more than $715 million, as of December 31, 2018. Large contribution plans, like the Plan, have significant bargaining power to demand low-cost investment management services. Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendant engaged in a flawed process by offering and retaining high-cost and poor-performing investments compared to available alternatives and allowed unreasonable and unnecessary expenses to be charged to participants for administration of the Plan.

7.      As discussed herein, Defendant breached its fiduciary duties by failing to manage and operate the Plan in a prudent manner or in the best interests of the Plan or Plan participants. First, Defendant failed to utilize a prudent process or methodology when selecting and monitoring the investment options for the Plan. The lack of a prudent process or methodology is demonstrated by, among other things, the following: (i) Defendant selected share-classes of mutual funds that had higher fees and expenses than other available share classes of the exact same mutual funds; (ii) the Plan offered funds targeted at retail investors which had higher expenses than more prudent investment options available to the Plan; and (iii) six out of the seven primary investment options (other than Target Date, money market, and insurance contract options) were actively managed mutual funds, even though the Plan could have easily offered a selection of passively managed funds with lower expenses.

8.      Second, Defendant's choice of structure for the Plan's the administrative, recordkeeping, and other expenses raised the likelihood of excessive fees for these services. The Plan's primary recordkeeper and service provider during the Class Period was AIG Retirement

- 3 -

Services, commonly known as VALIC ("VALIC"). Based on WakeMed's Form 5500 filings during the Class Period, the Plan appears to pay VALIC directly for services rendered during the Class Period, while also paying VALIC gross annual administrative fees based on a percentage of mutual fund assets in connection with what is commonly referred to as revenue sharing. If the benefits of revenue sharing do not outweigh this concern, the Plan's administrative and recordkeeping fee payments would be excessive and against the interests of Plan participants. Any unnecessary revenue sharing would have deprived the Plan of a portion of its assets for a period of time, causing the Plan to lose out on their growth prior to their reimbursement.

9.     Prudent and impartial plan sponsors must establish and follow procedures to monitor both the performance and cost of the investments selected for their plans and investigate alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants. Defendant's failures to offer prudent investment options and eliminate unnecessary fees were the result of a failure of effort or of competence, either of which was in violation of its fiduciary duties under ERISA. Defendant's actions were contrary to those of a reasonable fiduciary and cost the Plan and its participants millions of dollars in excessive fees. Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. §1104. Based on this conduct, Plaintiffs assert claims against Defendant for breach of the fiduciary duties of loyalty and prudence, and failure to monitor fiduciaries.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

- 4 -

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

12.     This Court has personal jurisdiction over Defendant because it transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

13.     Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendant may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant resides and/or does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiffs

14.     Plaintiff Sarah Conte resides in Chapel Hill, North Carolina and was a participant in the Plan during the Class Period. As a participant, plaintiff Conte invested in the mutual funds which are at issue in this action.

15.     Plaintiff Joanne Touchberry resides in Wake Forest, North Carolina and was a participant in the Plan during the Class Period. As a participant, plaintiff Touchberry invested in the mutual funds which are at issue in this action.

16.     Plaintiff Tekisha L. Nicholson resides in Wendell, North Carolina and was a participant in the Plan during the Class Period. As a participant, plaintiff Nicholson invested in the mutual funds which are at issue in this action.

- 5 -

17.     Plaintiff Toby Beliveau resides in Cary, North Carolina and was a participant in the Plan during the Class Period.  As a participant, plaintiff Beliveau invested in the mutual funds which are at issue in this action.

18.     Plaintiff Alexander Carlisle resides in Franklinton, North Carolina and was a participant in the Plan during the Class Period.  As a participant, plaintiff Carlisle invested in the mutual funds which are at issue in this action.

19.     Plaintiff Earlene N. Hunter resides in Nashville, North Carolina and was a participant in the Plan during the Class Period.  As a participant, plaintiff Hunter invested in the mutual funds which are at issue in this action.

20.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendant's unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  For example, Plaintiffs were not aware of the comparable, but lower-cost, alternatives to the investments offered by the Plan, information regarding other available share classes, and information regarding the unnecessary and inflated expenses charged to the Plan.

22.     Much of the information necessary to evaluate the process – or lack thereof – engaged in by the Plan's fiduciaries on behalf of the Plan are within the exclusive control of WakeMed.  Accordingly, Plaintiffs did not have actual knowledge of the details of Defendant's

decision-making process concerning the Plan, including its processes, or lack thereof, for selecting, monitoring, and removing Plan investments. This information is solely within the possession of Defendant prior to discovery. *See Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer."). Plaintiffs, lacking Defendant's experience in managing a large 403(b) plan, lacked actual knowledge of reasonable fee and expense levels and prudent alternatives available to such plans. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon, among other things, the facts set forth herein.

**Defendant**

23. Defendant WakeMed, based in Raleigh, North Carolina, is the Plan sponsor, Plan Administrator and named fiduciary for the Plan, as described in the Plan Document and Summary Plan Description.

(a) WakeMed describes itself as a not-for-profit health care system and that its 941-bed system comprises a network of facilities throughout the Triangle area including three full-service hospitals, seven emergency departments, a dedicated Children's Hospital and Rehabilitation Hospital, more than 80 physician offices and Wake County's only Level I Trauma Center. WakeMed has more than 9,700 employees, 1,300 affiliated physicians and 525 employed physicians.

(b) WakeMed, acting through its employees, officers, and Board of Directors, performs discretionary Plan-related fiduciary functions, including the selection of investment options for the Plan and the negotiation and agreement over services and fees for the Plan. As Plan administrator, WakeMed is responsible for the administration and operation of the Plan and has exercised many duties and responsibilities in connection with the operation of the Plan.

- 7 -

Defendant WakeMed is a fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §1002(21)(A).

## THE PLAN

24.     The Plan is a "defined contribution" plan within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34), which is intended to qualify under Section 403(b) of the IRC. The Plan became effective on January 1, 1990.  The Plan is maintained by WakeMed and WPP, and employees of both of those entities are eligible to participate in the Plan.

25.     Under the Plan, participants may elect to have a portion of their salary deposited directly into an account on a pre-tax basis.  Participants may also make contributions in the form of a rollover of funds from another qualified plan.  In addition, participants may be eligible to receive an additional employer contribution to the Plan on the participant's behalf.  The benefits available to participants under the Plan are based solely upon the amounts contributed to their accounts, and any income, expense, gains and losses, will be allocated to a participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

26.     Participants are immediately 100% vested in employee salary and rollover contributions and any income or loss thereon, and are fully vested upon reaching normal retirement age, death, or permanent disability.  Vesting in WakeMed's contribution portion of their accounts, plus actual earnings thereon, is based on years of service.  Participants are 100% vested in contributions made by WakeMed after three years of service.

27.     WakeMed benefits from the Plan's matching program because offering retirement plans with matching contributions can help to attract new employees and reduce turnover.

28.     WakeMed is the designated Plan Administrator under the Plan and the named fiduciary of the Plan.  WakeMed has the power to name another person or persons as a named

- 8 -

fiduciary. According to the Plan Document, the Plan Administrator is supposed to "administer the Plan for the exclusive benefit of the Plan Participants and Beneficiaries, and in accordance with the terms of the Plan." WakeMed, as Plan Administrator, may delegate its duties, powers or responsibilities to one or more persons.

29.     WakeMed, as the Plan Administrator, has the general responsibility to control and manage the operation of the Plan and has the power to adopt rules and procedures to govern participant investment elections and directions under the Plan. Specifically, the Plan Administrator's responsibilities include, but are not limited to, the following: (i) to interpret the Plan, including the authority to resolve ambiguities in the Plan document and to interpret the Plan's terms, including who is eligible to participate under the Plan and the benefit rights of participants and beneficiaries; (ii) to develop procedures for the direction of investment by Participants and the allocation of investment earnings to Participant accounts; (iii) to retain the services of other persons, including investment managers, attorneys, consultants, advisers and others, to assist in the administration of the Plan; and (iv) to correct any defect or error in the operation of the Plan.

30.     Upon information and belief, WakeMed delegated its responsibilities as Plan Administrator and fiduciary to at least one or more people during the Class Period.

31.     VALIC has served as the Plan Provider since spring 2007, serves as the primary recordkeeper for the Plan, and performs various administrative and brokerage functions. VALIC received both direct and indirect compensation from the Plan during the Class Period.

32.     AIG Federal Savings Bank, State Street Bank and Trust Company, Fidelity Management Trust Company, Great American Insurance Group, and Transamerica Financial Life Insurance Company (collectively, the "Custodians") hold the Plan's investments and participant notes receivable and execute all related transactions.

- 9 -

33.     During most of the Class Period, other than a fixed-interest account and money market mutual fund, the Plan offered approximately thirteen mutual funds as investment options to Plan participants, comprised of: (i) six actively managed mutual funds; (ii) five target date funds; and (iii) a passively managed stock index fund targeting the S&P 500, and a passively managed bond fund.  For example, during 2018, the Plan offered: (i) six actively managed mutual funds (American Funds Europacific Growth A; Eaton Vance Atlanta Capital SMID-Cap A; Fidelity Low-Priced Stock; T. Rowe Price New America Growth Advisor; Vanguard Wellington Admiral; and Vanguard Windsor II Admiral); (ii) five Vanguard Target Retirement Funds for the years 2030 to 2060; and (iii) an S&P 500 passively managed index fund (the Vanguard Institutional Index Instl Pl), and a passively managed bond fund (the Vanguard Total Bond Market Index Inst).

34.     Furthermore, in addition to direct payments of expenses to service providers, Defendant obligated the Plan participants to unnecessarily pay administrative fees based on a percentage of assets.  For example, during 2018, the gross annual administrative fee assessed on mutual fund assets in the Plan was 0.12%.

35.     As alleged herein, the structure of investment options, the offering of high cost share classes when lower share classes were available, the inclusion of predominantly actively managed mutual funds, and the unnecessary expense assessments based on a percentage of assets, were the result of a faulty, imprudent, and disloyal process by the Plan's fiduciaries.

## DEFENDANT'S FIDUCIARY DUTIES UNDER ERISA

36.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA §402(a)(1), 29 U.S.C. §1102(a)(1).

37.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §402(a)(1), 29 U.S.C. §1102(a)(1), but also any other persons who in fact perform fiduciary

- 10 -

functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i).

38. As described in the Parties section above, Defendant was a fiduciary of the Plan because:

(a) it was so named; and/or

(b) it exercised authority or control respecting management or disposition of the Plan's assets;

(c) it exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d) it had discretionary authority or discretionary responsibility in the administration of the Plan.

39. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendant as a fiduciary of the Plan. These duties, which require fiduciaries to act "solely in the interest of [plan] participants and beneficiaries," 29 U.S.C. §1104(a)(1), are "the 'highest known to the law.'" *Howard*, 100 F.3d at 1488 (citation omitted); *LaScala*, 479 F.3d at 219. Section 1104(a)(1) states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

- 11 -

(i)     providing benefits to participants and their beneficiaries; and

(ii)     defraying reasonable expenses of administering the plan;

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. §1104(a)(1).

40.     According to the DOL, the "primary responsibility of fiduciaries is to run the plan solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits and paying plan expenses."[1] Thus, ERISA fiduciaries "must avoid conflicts of interest" and "may not engage in transactions on behalf of the plan that benefit parties related to the plan, such as other fiduciaries, services providers or the plan sponsor." *Id.* The duty of loyalty prohibits fiduciaries from acting in service of their own interests or those of a third party to the detriment of plan participants, including by charging or allowing to be charged excessive fees in plan investment options.

41.     ERISA "'imposes a "prudent person" standard by which to measure fiduciaries' investment decisions and disposition of assets.'" *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (citation omitted). This means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. §1104(a)(1)(B). As the UPIA observes: "Wasting beneficiaries' money is imprudent. In devising and implementing

_____

[1]     *See* Department of Labor, *Fiduciary Responsibilities*, https://www.dol.gov/general/topic/retirement/fiduciaryresp (last visited Aug. 19, 2020) (emphasis added).

- 12 -

strategies for the investment and management of trust assets, trustees are obliged to minimize costs." UPIA §7 cmt.

42. In addition to a duty to select prudent investments, a fiduciary under ERISA "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1828 (2015). Indeed, in *Tibble*, the Court held that "an ERISA fiduciary's duty is 'derived from the common law of trusts,'" and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones[,]" referencing the UPIA, treatises, and seminal decisions confirming the duty. *Id*. at 1828. If an investment is imprudent, the plan fiduciary "'must dispose of it within a reasonable time.'" *Id*. (citation omitted). Fiduciaries therefore may be held liable for either assembling an imprudent menu of investment options or for failing to monitor the plan's investment options to ensure that each option remains prudent.

43. ERISA also imposes co-fiduciary duties on plan fiduciaries for participating in, enabling or failing to remedy a breach by another fiduciary. Section 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

- 13 -

44.     Although ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan," that duty exists only "insofar as such documents and instruments are consistent with" the other duties imposed upon fiduciaries by ERISA. 29 U.S.C. §1104(a)(1)(D). "This provision makes clear that the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Dudenhoeffer*, 573 U.S. at 421.

45.     Because ERISA is derived from trust law, the Supreme Court has stated that courts should seek guidance from trust law where ERISA is silent. *Tibble*, 135 S. Ct. at 1828; *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).

## SUBSTANTIVE ALLEGATIONS

### Fees Substantially Impact Returns on Investment

46.     In defined-contribution plans, such as the Plan, the amount of funds available to a participant at retirement is dependent upon the amount of contributions and the return on investment. Fees paid by a plan participant reduce the amount available for investment and negatively impact the total return on investment.

47.     As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 135 S. Ct. at 1826. Because retirement savings in defined contribution plans grow and compound over the course of an employee-participant's career, excessive fees (as well as poor investment performance) can dramatically reduce the amount of funds available for a participant by the time of retirement. Over time, due to the power of compounding, even apparently minor differences in investment fees and performance can result in drastic differences in the funds available at retirement.

- 14 -

48.     The following example from the DOL illustrates how fees and expenses can impact a participant's retirement account:

> Assume that you are an employee with 35 years until retirement and a current 401(k) account balance of $25,000. If returns on investments in your account over the next 35 years average 7 percent and fees and expenses reduce your average returns by 0.5 percent, your account balance will grow to $227,000 at retirement, even if there are no further contributions to your account. If fees and expenses are 1.5 percent, however, your account balance will grow to only $163,000. The 1 percent difference in fees and expenses would reduce your account balance at retirement by 28 percent.[2]

**Very Few Actively Managed Funds Consistently Outperform Market Indexes or Passively Managed Funds**

49.     During the Class Period, investment options within the Plan charged certain fees, to be paid by deductions from the pool of assets under management. Fees were in part determined by the level of the fund manager's activity involved in the selection of securities for the fund. Passively managed funds, also known as "index funds," attempt to mirror the components of a particular market index such as the Standard & Poor's 500. Conversely, actively managed funds select securities based on different strategies in an attempt to beat a designated benchmark. Because actively managed funds call for sophisticated research and judgment calls, they often carry significantly higher fees than those of passively managed funds.

50.     Even though actively managed funds attempt to beat their comparative indexes, most actively managed funds are unable to do so. As such, very few actively managed funds are able to outperform passively managed funds. Studies show that "most actively managed funds

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Sept. 2019), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

- 15 -

failed to survive and outperform their passive peers, especially over the trailing 10-year period."[3] In other words, "[t]he average dollar in passively managed funds typically outperformed the average dollar invested in actively managed funds."[4]

51.     Similarly, S&P DJI publishes the SPIVA U.S. Scorecard, a widely referenced research report which compares the performance of actively managed funds against their appropriate benchmarks.  These reports have found that "relatively few active managers are able to outperform passive managers over any given time period, either short-term or long-term."[5]  For instance, the mid-year 2016 Scorecard found that during the measured one-year period, 84.62% of large-cap managers, 87.89% of mid-cap managers, and 88.77% of small-cap managers underperformed the S&P 500, the S&P MidCap 400, and the S&P SmallCap 600 benchmarks, respectively.

52.     Accordingly, even though actively managed funds attempt to outperform their benchmarks, passively managed funds with comparable investment strategies charge lower fees and generally perform better over the long-term.  According to an analysis by the investment research firm Morningstar, Inc. ("Morningstar"), "higher-cost funds are more likely to either underperform or be shuttered or merged away," while "lower-cost funds are not only more likely to survive, but also displayed greater odds of success."[6]  The difference in fees and performance between actively and passively managed funds can dramatically impact returns over time.

---

[3] *See* Johanna Bennett, *Morningstar: Active Fund Managers Suffer*, Barron's, Aug. 19, 2016, available at http://blogs.barrons.com/focusonfunds/2016/08/19/morningstar-active-fund-managerssuffer/.

[4] *Id.*

[5] *See* About Spiva, https://us.spindices.com/spiva/#/about (last visited Aug. 19, 2020).

[6] *See* Bennett, *supra* note 3.

53.     This difference can compound dramatically.  According to a February 15, 2014 report by The Atlantic, the difference between the average cost of an actively managed fund and the lower cost of a passively managed fund can reduce retirement savings by more than six figures over the course of a career.  For example, if a 25-year-old employee is offered two funds, a passively managed index fund with an 0.08% fee, and an actively managed fund with an 1.33% fee, and both funds achieve a 7% average annual return, and the employee contributes $3,000 every year, the employee would have considerably more money in the passively managed fund. The employee would have $15,000 more at age 45, $55,000 more at 55, $159,000 more at 65, and $257,000 more at 70 in the passively managed fund compared with the actively managed fund. "That's because you don't just lose the money you pay in fees.  You lose the returns you could have had on the money you pay in fees, too."[7]  This scenario is reflected in the below chart:[8]

---

[7] *See* Matthew O'Brien, *The Crushingly Expensive Mistake Killing Your Retirement*, The Atlantic, Feb. 15, 2014, available at https://www.theatlantic.com/business/archive/2014/02/the-crushinglyexpensive-mistake-killing-your-retirement/283866/.

[8] *Id*.



**Defendant Breached Its Fiduciary Duties by
Failing to Investigate or Offer Lower-Cost
Investments that Were Available to the Plan**

54.     Defendant failed to follow a prudent process when selecting and monitoring the

investment options in the Plan and thereby breached its fiduciary duties.  Instead of prudently

investigating, selecting, and monitoring investment options to ensure they were in the best interests

of the Plan and its participants, Defendant caused the Plan to offer investment options that wasted

the assets of the Plan and its participants.

55.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid

unwarranted costs" by being aware of the "availability and continuing emergence" of alternative

investments that may have "significantly different costs."  Restatement (Third) of Trusts, ch. 17,

intro. note (2007); *see also* Restatement (Third) of Trusts, §90 cmt. B (2007) ("Cost-conscious

management is fundamental to prudence in the investment function.").  Adherence to these duties

requires regular performance of an "adequate investigation" of existing investments in a plan to

- 18 -

determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Benefit Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

56.    An examination of the investment options offered by the Plan makes clear that Defendant did not fulfil its fiduciary obligations.

**Defendant Failed to Utilize Lower Cost Share Classes of the Same Mutual Funds**

57.    Mutual funds often offer multiple classes of shares of a single mutual fund in which the portfolio for all share classes are identical but the associated fees vary based on the target market of the purchaser or the size of their investment.  Typically, share classes targeted to smaller or retail investors have lower investment minimums but higher fees and sometimes more trading restrictions than those aimed at larger or institutional investors.  Share classes designed for the retail market, such as A, B, and C classes, may carry upfront sales charges, exit fees if the shares are sold within a specified period of time, or higher ongoing expense ratios compared with institutional share classes.  The higher amount of fees and other structural differences may also cause retail shares to be more profitable for investment consultants that provide them to their clients.  Accordingly, it was in the best interests of Plan participants for the Plan to offer the lowest cost institutional shares possible.  Nevertheless, as alleged below, the Plan sometimes offered retail classes of funds even though cheaper institutional share classes were available to the Plan.

58.    Large defined contribution plans, such as the Plan, have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known that minimum investment requirements are "routinely waived" for individual investors in large retirement-savings plans. *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020); *Sweda*

- 19 -

*v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble*, 729 F.3d 1100, 1137 n.24 (9th Cir. 2013)).  As a result, prudent fiduciaries of large retirement plans, such as the Plan, will utilize their superior bargaining power to search for and select the lowest-priced share class available.

59.     Indeed, the Supreme Court has stated:

> Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, ***a prudent fiduciary would know immediately that a switch is necessary***. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately.

*Tibble v. Edison Int'l*, No. 07-5359, 2017 WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017) (emphasis added).

60.     Contrary to its fiduciary obligations, however, Defendant improperly selected retail share classes of various mutual funds and failed to remove investment options that had expensive share classes even though lower cost share classes of the identical mutual funds were available to the Plan throughout the Class Period.  There is no good-faith explanation for Defendant utilizing high-cost share classes when lower-cost share classes were available for the exact same investments.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only result was higher costs for Plan participants.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the below-referenced funds into the lower share classes at the earliest opportunity.

61.     Indeed, throughout the entire Class Period, the Plan offered as investment options mutual fund share classes that were substantially more expensive than other share classes of the same funds.  The below chart lists each of the primary funds offered by the Plan during 2018 and the expense ratios for those funds compared with the expense ratios for cheaper share classes of

- 20 -

the same funds that were available for inclusion in the Plan but were not offered to Plan participants due to Defendant's breaches of fiduciary duty:

| Current Fund | Assets | 2018 ER | Lower Cost Share Class | Lower Cost Share Class ER (2018) | Basis Points Overpayment | % Overpayment | $ Overpayment |
|---|---|---|---|---|---|---|---|
| American Funds EuroPacific Growth A | $73,921,727 | 0.82% | Class R-6 | 0.49% | 0.33 | 67% | $243,941.69 |
| Eaton Vance Atlanta Capital SMID-Cap A | $55,144,648 | 1.19% | Class R-6 | 0.84% | 0.35 | 42% | $193,006.27 |
| T. Rowe Price New America Growth Adv[9] | $60,886,242 | 1.06% | Class I | 0.66% | 0.40 | 61% | $243,544.97 |
| Fidelity Low-Priced Stock | $40,442,857 | 0.62% | Class K | 0.53% | 0.09 | 17% | $36,398.57 |
| Franklin Small-Mid Cap Growth A[10] | $49,145,134 (2017) | 0.96% | Class R-6 | 0.48% | 0.48 | 100% | $235,896.64 |
| Vanguard Wellington Inv[11] | $131,043,477 | 0.25% | Vanguard Wellington Admiral | 0.17% | 0.08 | 47% | $104,834.78 |
| Vanguard Windsor II Inv | $35,507,279 | 0.34% | Vanguard Windsor II Admiral | 0.26% | 0.08% | 31% | $28,405.82 |

---

[9] According to a supplemental Plan disclosure, dated July 14, 2020, the share class for the T. Rowe Price New America Growth fund was changed to a share class with an expense ratio of 0.79%.

[10] The Franklin Small-Mid Cap Growth A fund was removed from the Plan during 2018 so expense ratios for 2017 are listed for that fund in the chart.

[11] The Plan began offering admiral class shares of both Vanguard Wellington and Vanguard Windsor II at some point after October 2019. However, for most of the Class Period, the Plan participants were only offered the more expensive share class, resulting in unnecessary fees.

- 21 -

62.     Additionally, the Plan offered the Victory RS Partners A (retail share class) as an investment option during 2014 and 2015, even though the Victory Partners Y shares (institutional share class) with lower expenses were available.

63.     As reflected in the chart above, Plan participants paid grossly excess fees during 2018 of more than $1.08 million as a result of Defendant's breach of fiduciary duty.  For example, Plan participants overpaid by *67%* for the American Funds EuroPacific Growth Fund, *61%* for the T. Rowe Price New America Growth Fund, and *100%* for the Franklin Small-Mid Cap Growth Fund.  Plan participants paid excess fees in substantially similar amounts during each year of the Class Period because cheaper fund classes were available but not offered by the Plan.  In addition to suffering harm from the excess fees, Plan participants lost out on the compound growth of their investments due to the payment of excess fees.

64.     During the Class Period, Defendant knew or should have known of the existence of cheaper share classes *for the exact same mutual funds* and therefore should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

65.     As discussed above, qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  Investment minimums, however, are often waived for large plans, and as reflected in the chart above in ¶57, the Plan's assets under management for each fund ranged from approximately $35 million to $131 million, easily qualifying them for lower share classes.

66.     Thus, by failing to investigate and substitute the lower cost share classes, Defendant caused the Plan to pay millions of dollars in unnecessary fees.

**Defendant Included Relatively Expensive and Underperforming Mutual Funds in the Plan and Failed to Account for "Style Drift"**

67.     Defendant's selection and retention of certain actively managed mutual funds over other similar actively managed funds also demonstrates their lack of a prudent process and failure to act in the best interest of Plan participants.   In particular, Defendant allowed: (i) poorly performing mutual funds to be added and maintained in the Plan's investment lineup; (ii) relatively expensive mutual funds to be added and maintained in the Plan's investment lineup; and (iii) numerous mutual funds to remain in the Plan's investment lineup as they experienced gradual shifts in style and capitalization, a phenomenon referred to as "style drift," which has numerous detriments, including reducing diversification in the Plan's investments over time.

68.     During the Class Period, at least three mutual funds offered in the Plan significantly underperformed, as illustrated below.  The American Funds EuroPacific Growth A and Eaton Vance Atlanta Capital SMID-Cap A are still offered in the Plan.

American Funds EuroPacific Growth A:

| Years | Morninstar Quantitative Rank | % Rank | +/- Category Average | +/- Index |
|-------|------------------------------|--------|----------------------|-----------|
| 1     | 3                            | 60     | -3.99                | -3.00     |
| 3     | 3                            | 63     | -1.86                | -2.03     |
| 5     | 3                            | 56     | -1.00                | -1.46     |
| 10    | 3                            | 62     | -0.69                | +.04      |

Eaton Vance Atlanta Capital SMID-Cap A:

| Years | Morninstar Quantitative Rank | % Rank | +/- Category Average | +/- Index |
|-------|------------------------------|--------|----------------------|-----------|
| 1     | 4                            | 98     | -29.7                | -28.44    |
| 3     | 4                            | 84     | -6.61                | -8.15     |
| 5     | 4                            | 76     | -2.85                | -4.1      |
| 10    | 3                            | 54     | -.03                 | -1.36     |

Victory RS Partners A:

- 23 -

| Year | Morninstar Quantitative Rank | % Rank | +/- Category Average | +/- Index |
|------|------------------------------|--------|---------------------|-----------|
| 1 | 4 | 96 | -12.69 | -19.64 |
| 3 | 4 | 81 | -2.65 | -5.28 |
| 5 | 3 | 68 | -.87 | -3.19 |
| 10 | 4 | 91 | -1.78 | -2.97 |

69.     All three of these mutual funds, in addition to others, also experienced style drift as of September 30, 2020, as illustrated below:

| Fund | Current Morningstar Category/Benchmark | Percentage of Deviation from Category |
|------|----------------------------------------|---------------------------------------|
| American Funds EuroPacific Growth A | Foreign Large Growth/MSCI ACWI Ex USA | 43% of fund is not Growth, 8% is not Large Cap |
| Eaton Vance Atlanta Capital SMID-Cap A | Mid-Cap Growth /Russell Mid Cap Growth | 57% of fund is not Growth |
| Franklin Small-Mid Cap Growth A | Mid Cap Growth/Russell Mid Cap Growth | 25% of fund is neither Mid Cap nor Small Cap, 34% is not Growth |
| Victory RS Partners A | Small Blend/Russell 2000 | 42% of fund is not Blend, 12% is not Small Cap |
| Fidelity Low-Priced Stock | Mid Cap Value/Russell Mid Cap Value | 59% of fund is not Mid Cap, 54% is not Value |
| T. Rowe Price New America Growth Adv | Large Growth/Russell 1000 Growth | 41% of fund is not Growth, 14% is not Large Cap |

70.     The occurrence of style drift highlights another downside of active money managers – that their funds require active monitoring by fiduciaries to ensure that they remain true to their stated categories and objectives.  Style drift ultimately changes the risk level in the fund and increases the likelihood of a reduction in diversification, investment overlap, correlation, concentration risk, and volatility.  If Defendant had acted prudently, it would have recognized that style drift was occurring in numerous funds and acted to adjust the Plan's investment lineup.

71.     Additionally, as shown below, four mutual funds, including the American Funds EuroPacific Growth A and Eaton Vance Atlanta Capital SMID-Cap A, which underperformed and

experienced style drift, were also substantially more expensive than the median cost of comparable funds in similarly sized plans (between $500m and $1b in assets):[12]

| Fund | Expense Ratio[13] | Category | ICI Median[14] |
|------|------|------|------|
| Eaton Vance Atlanta Capital SMID-Cap A | 1.22% | Domestic Equity | 0.42% |
| T. Rowe Price New America Growth Adv | 1.06% | Domestic Equity | 0.42% |
| Fidelity Low-Priced Stock | 0.88% | Domestic Equity | 0.42% |
| American Funds EuroPacific Growth A | 0.83% | International Equity | 0.54% |

72.     As of March 31, 2020, six of the Plan's mutual fund offerings were domestic equity and international equity mutual funds. However, as shown above, the same four funds were substantially more expensive than comparable funds and were experiencing style drift, and two of those funds were also underperforming.

73.     The relative high cost of the funds in the Plan, the selection and retention of underperforming funds, and the failure to account for style drift reveal Defendant's disregard for the high costs borne by Plan participants and constitutes a breach of its fiduciary duties.

**Defendant's Failure to Offer Better Performing and Lower Cost Passively Managed Funds**

74.     Defendant also breached its fiduciary duties by selecting and maintaining a majority of the Plan's investment options as actively managed mutual funds, which are more expensive but rarely outperform passively managed funds. Despite the recognized benefits of passively managed funds, six of the seven primary investment options (other than the target date and money market

---

[12]     *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 at 62 (June 2019) available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

[13]     The expense ratios are taken from the funds' SEC filings for 2016.

[14]     The median expense ratio is taken from plans with $500m to $1b in assets.

funds) were actively managed, with expense ratios as high as 1.25% (Eaton Vance Atlanta Capital SMID-Cap A in 2014) and 1.07% (T. Rowe Price New America Growth Adv in 2017).

75.     In an actively managed fund, an investment manager spends time selecting stocks or bonds to hold and generate investment returns in excess of its benchmark. Index funds and other passively managed funds, recognized as appropriate investments for a fiduciary to consider, hold a representative sample of securities in a specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or research is needed, thus, the fees in index funds are substantially lower.

76.     Active money managers, in their pursuit to outperform their benchmarks and their peer group, will take additional risk to do so. Even if an active money manager outperforms their benchmark over a short period of time, they expose participants to additional risks and volatility. And many studies show that most active managers are unable to outperform their benchmarks over a long period of time. Any potential short-term outperformance by an actively managed mutual fund is nearly always eclipsed by mutual fund expenses, and even if an individual high-cost mutual fund demonstrates market outperformance over a particular period of time, it is unlikely that it will maintain that performance. The worst-performing mutual funds show a strong tendency to continue their poor performance.

77.     Because investment costs are of paramount importance to a prudent investment selection, a retirement plan fiduciary acting prudently and in the best interests of Plan participants would ensure that the Plan offers an adequate selection of passively managed index funds. Even if Defendant determined that offering actively managed funds were prudent, it should have also offered a selection of passively managed funds as options for participants. Plan participants were clearly interested in investing in passively managed funds. As of the end of 2018, over

- 26 -

$85,700,000 of the Plan's assets were invested in the passively managed Vanguard Institutional Index, making it the third-largest Plan investment, after the VALIC Fixed Interest Account and the Vanguard Wellington fund. Plan participants, however, were unable to invest in any other passively managed funds because none were offered.

78. According to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans have an average of fifteen investment options, excluding target date funds.[15] In contrast, the Plan only offered nine mutual funds other than the five Vanguard target date funds. Therefore, a prudent fiduciary would have increased the number of investment options by including a selection of passively managed funds for Plan participants.

79. Defendant's ongoing failure to consider materially similar but cheaper alternatives to the Plan's investment options constitutes a breach of its fiduciary duties. The chart below demonstrates that the expense ratios of the Plan's investment options were vastly more expensive than comparable passively managed alternative funds in the same investment style.

80. As reflected in the below chart, which lists details about the Plan's investments during 2018 (unless otherwise indicated), Defendant could have substantially reduced expenses by offering passively managed funds to Plan participants:

| Current Fund | Assets ($) | Expense Ratio (%) | Category | Alternative Index Fund | Alternative Index Fund Expense Ratio | Excess Basis Points | Excess Fees (%) | Overpayment ($) |
|---|---|---|---|---|---|---|---|---|
| Eaton Van ATL CAP SMID CAP A | 55,144,648 | 1.19 | US Mid-Cap Growth | Vanguard Mid Cap Growth Index Adm | 0.07% | 1.09 | 1,700 | 617,620.06 |

---

[15] Callan Investments Institute, 2015 Defined Contribution Trends, at 28 (2015).

| Current Fund | Assets ($) | Expense Ratio (%) | Category | Alternative Index Fund | Alternative Index Fund Expense Ratio | Excess Basis Points | Excess Fees (%) | Overpayment ($) |
|---|---|---|---|---|---|---|---|---|
| T. Rowe Price New America Growth Adv[16] | 60,886,242 | 1.06 | Large Cap Growth | Fidelity Large Cap Growth Index (6/7/16) | 0.035% | 1.025 | 3,028.57 | 624,083.98 |
| Vanguard Wellington INV | 131,043,477 | 0.25 | Allocation: 50%-70% Equity | Vanguard Balanced Index Adm | 0.07% | 0.18 | 357.14 | 253,878.26 |
| Franklin Small-Mid Cap Growth A (2014-2017) | 49,145,134 (2017) | 0.91 | Midcap Growth | Vanguard Mid Cap Growth Index Adm | 0.07% | 0.84 | 1,300 | 412,819.12 |
| (Victory) RS Partners A (In Plan 2015, 2014) | 17,838,717 (2015) | 1.45 | Small Blend | Vanguard Russell 2000 Index I | 0.08% | 1.37 | 1,812.5 | 244,390.42 |

81.     As set forth in the above chart, by failing to offer passively managed fund choices, Defendant caused Plan participants to collectively spend more than $2.1 million in excess fees for the year represented for each fund in the chart. Plan participants paid excessive fees during each year of the Class Period. The comparator funds above belong to the same peer groups as the Plan's funds. A reasonable investigation by Defendant would have revealed the existence of lower-cost passively managed alternatives to the Plan's investment options.

**Defendant Breached Its Fiduciary Duties by Causing Plan Participants to Pay Excessive Administrative and Recordkeeping Fees**

82.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping is a necessary service for every defined contribution plan, and the market for recordkeeping services

---

[16]   According to a supplemental Plan disclosure dated July 14, 2020, the share class for the T. Rowe Price New America Growth fund was changed to a share class with an expense ratio of 0.79%.

- 28 -

is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans, like the Plan. Recordkeepers typically vigorously compete for business and differentiate themselves by offering a lower price.

83.     Recordkeeping expenses can either be paid by the Plan sponsor, directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing. Revenue sharing payments are made by investments within a plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

84.     The Plan's Form 5500s during the Class Period suggest that the Plan directly paid VALIC between $828,000 and $1,004,247 for recordkeeping and other services, and that Plan participants also indirectly paid administrative costs based on a percentage of the assets of Plan participants. For example, Plan participants paid $0.12% of assets in administrative costs to VALIC during 2018.

85.     Since the Plan paid VALIC directly, these indirect payments, which were purportedly rebated back to the Plan at some point, may have been excessive and can cause the Plan to lose out on the compound growth of the assets eventually rebated. Paying VALIC both directly and indirectly raised the risk of significant rebated amounts, which could add up over time without proper monitoring. As a result, this compensation structure may not have been the best use of the Plan's assets. There may also have been more prudent investment alternatives or structures available to the Plan that were not selected because of WakeMed's commitment to revenue sharing.

- 29 -

## CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

> All participants in or beneficiaries of the WakeMed 403(b) Plan from August 25, 2014 to the date of Judgment (the "Class Period").

87.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 1, 2018, the Plan had over 14,100 participants.

88.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, *inter alia*:

(a)     whether Defendant is a fiduciary of the Plan;

(b)     whether Defendant breached its fiduciary duties of loyalty and prudence with respect to the Plan;

(c)     whether Defendant had a duty to monitor other fiduciaries of the Plan;

(d)     whether Defendant breached their duty to monitor other fiduciaries of the Plan; and

(e)     the extent of damage sustained by Class members and the appropriate measure of damages.

89.     Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

- 30 -

90. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

91. Plaintiffs have no interests that conflict with those of the Class. Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

92. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## COUNT I

### Breach of Fiduciary Duties of Prudence and Loyalty

93. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

94. WakeMed was a fiduciary of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) because it was designated in the Plan documents as the Plan Administrator, was a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and the negotiation over services and fees for the Plan, and was responsible for the administration and operation of the Plan.

95. As a fiduciary of the Plan, Defendant was required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act: "(A) for the exclusive purpose of: (i) providing benefits to

- 31 -

participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

96.     ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1.  The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones."  *Tibble*, 135 S. Ct. at 1828.

97.     As described above, Defendant failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways.  Defendant failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Defendant selected and retained investment options in the Plan despite their high cost relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

98.     In addition, Defendant may have failed to monitor or control excessive compensation paid for recordkeeping services, if any resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

- 32 -

99.     Through these actions and omissions, Defendant failed to discharge its duties with respect to the Plan: (A) solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); and (B) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

100.    Defendant knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties.  Defendant knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

101.    As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced.  Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), Defendant and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

- 33 -

## COUNT II

### Breach of Fiduciary Duties in Violation of Duty to Monitor

102.     Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

103.     Defendant had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

104.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

105.     Defendant also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

106.     Defendant breached its fiduciary monitoring duties by, among other things:

(a)     failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b)     failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class; and

- 34 -

(c)     failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

107.    As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

108.    Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## ENTITLEMENT TO RELIEF

109.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled to sue Defendant pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

110.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue Defendant for any appropriate equitable relief to redress the wrongs described above.

## PRAYER FOR RELIEF

111.    WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring that Defendant has breached its fiduciary duties under ERISA;

B.     Ordering Defendant to jointly and severally restore all losses to the Plan that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA §405;

C.     Entering an order requiring: (a) the disgorgement of profit made by Defendant; (b) declaring a constructive trust over any assets received by Defendant in connection with its breach of fiduciary duties, or violations of ERISA; (c) requiring the Plan to divest itself of investments in the imprudent investment options; and (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plan;

D.     Ordering, pursuant to ERISA §206(d)(4), 29 U.S.C. §1056(d)(4), that any amount to be paid to or necessary to satisfy Defendant's liability can be satisfied, in whole or in part, by attaching its accounts in or benefits from the Plan;

E.     Removing any breaching fiduciaries as fiduciaries of the Plan and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiffs or any member of the Class is a participant or beneficiary;

F.     Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plan and the management of the Plan's investments and/or selection of investment options and/or to oversee the divestment of the Plan's investments;

G.     Ordering the Plan's fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plan;

H.     Awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

I.     Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest;

- 36 -

J. Awarding such equitable, injunctive or other relief as the Court may deem appropriate pursuant to ERISA §502(a)(3) or any relief to which Plaintiffs and the Class are entitled to pursuant to Fed. R. Civ. P. Rule 54(c); and

K. Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

DATED: April 26, 2021

*/s/ Brian L. Kinsley*

BRIAN L. KINSLEY

CRUMLEY ROBERTS
BRIAN L. KINSLEY
2400 Freeman Mill Road, Ste. 200
Greensboro, NC 27406
Telephone: 336/333-9899
336/333-9894 (fax)
blkinsley@crumleyroberts.com

*Local Counsel*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
SARAH E. DELANEY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
sdelaney@rgrdlaw.com

*Counsel for Plaintiffs*

- 37 -

CAPOZZI ADLER, P.C.
MARK K. GYANDOH
GABRIELLE KELERCHIAN
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: 610/890-0200
717/233-4103 (fax)
markg@capozziadler.com
gabriellek@capozziadler.com

DONALD R. REAVEY
2933 North Front Street
Harrisburg, PA 17110
Telephone: 717/233-4101
717/233-4103 (fax)
donr@capozziadler.com

*Additional Counsel*